PETER J. FLINN, Respondent, *v.* THE NEW YORK CENTRAL AND HUDSON RIVER RAILROAD COMPANY, Appellant.

142    11
143   187
142    11
145   301
142    11
f165   350
165   351

A railroad company may not be made liable for the unavoidable or usual consequences to adjacent property of the proper operation of its road.

Where a building upon adjacent property is destroyed by fire, caused by sparks escaping from passing engines, to make the company liable for the loss, negligence in the management or condition of the engines must be proved.

It is the duty of the company to avail itself of the best mechanical contrivances and inventions in known practical use which are effective in preventing the burning of private property by the escape of sparks and coals from its engines; but this duty is limited to such contrivances as have been tested and put in use. The company is not bound at once to introduce a new appliance which it is claimed will have the effect to make its engines safer in the respect mentioned; it is entitled to a reasonable time for trial and experiment, and to make the necessary changes.

In an action to recover damages for injuries to and the final destruction of a building on plaintiff's premises which adjoined defendant's road these facts appeared : In 1874 defendant laid down a new track, which came within about three and a half feet of plaintiff's building. There was a steep grade in defendant's road where it passed plaintiff's lot, and engines, because of the heavy pull in drawing the trains up it, emitted large quantities of cinders and sparks; these frequently set fire to the building, and in 1884 it was destroyed by fire thus started. It did not appear that the fires were caused by any defects in said engines, and up to 1880 it was undisputed that defendant used upon its engines the

most approved spark arresters; there was a regular system of daily inspection of the smoke stacks and spark arresters, and if defects were discovered they were at once repaired. In 1880 a new spark arrester begun to come into use which reduced the number of escaping sparks. Defendant had, prior thereto, begun to use it in its freight engines, and had kept on altering them, and before the trial of the action the new system was in general, but not universal use. Defendant, after 1880, had a large number of engines in use. *Held,* the evidence did not justify a verdict for plaintiff; that defendant could not be charged with negligence in not fully introducing the new system of arresting sparks upon all of its engines previous to the fire, in the absence of evidence that it was reasonably practicable and possible so to do.

*Flinn* v. *N. Y. C. & H. R. R. R. Co.* (67 Hun, 631), reversed.

(Argued March 20, 1894; decided April 10, 1894.)

APPEAL from judgment of the General Term of the Supreme Court in the third judicial department, entered upon an order made February 15, 1893, which affirmed a judgment in favor of plaintiff entered upon a verdict and also affirmed an order denying a motion for a new trial.

The nature of the action, and the facts, so far as material, are stated in the opinion.

*Matthew Hale* for appellant. Defendant was not liable for any damage done to adjacent property unless it was proved that such damage was occasioned by the negligence of defendant or its servants. It was not liable for any incidental damages occasioned by the lawful operation of its road. (*U line* v. *N. Y. C. & H. R. R. R. Co.*, 101 N. Y. 98; *Conklin* v. *N. Y., O. & W. R. Co.*, 102 id. 107; *Rauenstein* v. *N. Y., L. & W. R. Co.*, 136 id. 528; *Bellinger* v. *N. Y. C. R. R. Co.*, 23 id. 42; *P., etc., R. R. Co.* v. *Hendrickson*, 80 Penn. St. 182; *P., etc., R. R. Co.* v. *Shultz*, 93 id. 341; *McCraig* v. *E. R. Co.*, 8 Hun, 599; *Collins* v. *N. Y. C. & H. R. R. R. Co.*, 109 N. Y. 243.) Upon the proof the jury had no right to find that the engines of defendant had caused the injury. (*McDermott* v. *N. Y. C. & H. R. R. R. Co.*, 8 Wkly. Dig. 531.) The jury must not be left to mere conjecture, and a bare possibility that the damage was caused in consequence

of the negligence and unskillfulness of the defendant is not sufficient. (*Searles* v. *M. R. Co.*, 101 N. Y. 661, 662; *Grant* v. *P. & N. Y. R. Co.*, 133 id. 657.) Railroad companies are not required to use any appliances which have not been tested, although approved by the highest scientific authority, but are required to use only those which have been tested and put into general use. (2 Wood's Railway Law, chap. 19, § 326; *Steinweg* v. *E. R. Co.*, 43 N. Y. 123; *Babcock* v. *F. R. Co.*, 140 id. 318.) It was incumbent upon plaintiff to show not only that the sparks came from defendant's engines, but that the injuries of which he complained were occasioned by the negligence of the defendant in not using the proper and sufficient means, and such as were in ordinary use for arresting the sparks. The maxim *res ipsa loquitur* has no application to the case. (*Wiedmer* v. *N. Y. E. R. Co.*, 114 N. Y. 462; *Cosulich* v. *S. O. Co.*, 122 id. 118; *Reiss* v. *N. Y. S. Co.*, 128 id. 103, 107.) The court erred in submitting to the jury the question whether defendant was negligent in not using a different smoke stack from what it did use. (*Babcock* v. *F. R. Co.*, 140 N. Y. 308.) How long and how heavy a train should be must be a matter for the railroad to decide, and the mere fact that trains were long and heavy, and needed two engines, could be no evidence of negligence. (58 Hun, 233, 234.) The court erred in charging the jury, at the request of plaintiff's counsel, that they were to determine what was the intrinsic value of the property that was destroyed, if they could find any evidence in the case as to what the intrinsic value was. (*Fox* v. *Phelps*, 17 Wend. 393; *Brown* v. *Hoburger*, 52 Barb. 15, 24; *Smith* v. *Griswold*, 15 Hun, 273; *Van Rensselaer* v. *Mould*, 48 id. 396, 401.)

*E. Countryman* for respondent. The evidence clearly justified the charge of negligence against the defendant. (2 S. & R. on Neg. § 668; *Vaughn Case*, 5 H. & N. 679; *Jonas Case*, L. R. [3 Q. B.] 733.) It was negligence in the defendant to build the easterly track so near to the line of the avenue, and so close to the plaintiff's building. (*Vaughan* v. *Menlone*, 3

Bing. [N. C.] 468; *Filliter* v. *Phifford*, 11 A. & El. 347.)
It was clearly, however, gross negligence to move heavy
trains up the grade on the easterly track so near the adjoining
buildings, without using the safest and most approved spark
arresters on the locomotives — especially such as were then in
use on its passenger engines. (*Caldwell Case*, 47 N. Y. 282;
2 S. & R. on Neg. § 672.) A *prima facie* case of negligence
for the jury was clearly proved against the defendant when it
was shown that the locomotives while moving up the grade
with heavy trains, and especially when, as frequently hap-
pened, they were unable with one at either end, to pull or
push the trains forward, vomited forth from their smoke
stacks large quantities of sparks and coals, some of the latter
as large as walnuts, throwing them in every direction upon
the adjoining property and setting the buildings on fire.
(*O'Neill Case*, 115 N. Y. 579; *Taunn Case*, 108 id. 624;
*Webb Case*, 49 id. 421.) It was unnecessary to identify the
particular engines that set the fire. (*Bevier Case*, 13 Hun,
254; *Johnson Case*, 54 Fed. Rep. 475, 476.) Even though
all needful appliances are used for the retention of sparks,
the company will still be liable, if by overcrowding the engine
the escape of sparks and fire is produced to a dangerous
extent, resulting in damage or destruction to property. (2 S.
& R. on Neg. § 674; *Pindar Case*, 53 Ill. 447.) While the
burden of showing negligence on the part of the defendant
occasioning the injury rests, in the first instance, upon the
plaintiff, proof that the injury was a result which would not
ordinarily have happened had the machinery been in proper
condition and operated with proper care is sufficient, and the
burden then rests upon the defendant to prove that the injury
was caused without its fault. (*Seybolt Case*, 95 N. Y. 562,
563; 2 S. & R. on Neg. § 676; *Case* v. *N. C. R. Co.*, 59
Barb. 644; *Field Case*, 32 N. Y. 339; *Reese Case*, 85 Ala.
497; *Goyette Case*, 132 Ill. 22.) The proof was abundant to
warrant the jury in finding that the fires were caused by the
defendant's locomotives. The plaintiff was not guilty of con-
tributory negligence. The rule of damages was correct.

(*Uline Case*, 101 N. Y. 99; *Pond Case*, 112 id. 186; *Colrick* v. *Swinburne*, 105 id. 503; 1 Sedg. on Dam. [8th ed.] §§ 243, 250, 252.) The jury had a right, in their discretion,.to add interest to the rents lost for six years, and the value of the building finally destroyed in 1884, on the trial. ( *Wilson* v. *Troy*, 135 N. Y. 96; *Walrath* v. *Redfield*, 18 id. 458, 462; *Parrott Case*, 46 id. 361, 369; *Moir's Case*, 89 id. 499, 507.) The evidence of the practice of defendant's servants in knocking holes in the netting over the smoke stack, the mode of operating the locomotives, and the results in the way of throwing sparks and coals and causing fires to property along the track, was proper. (*Richardson Case*, 91 U. S. 454; *Hinds* v. *Barton*, 25 N. Y. 544; *Steele Case*, 74 Cal. 323; *Hoyt* v. *Jeffers*, 30 Mich. 181.)

EARL, J. This is an action commenced December 2d, 1884, to recover damages for the injuries to and destruction by fire of the plaintiff's wooden dwelling house situated upon his lot adjoining the defendant's railroad in the city of Albany in the preceding August.

About 1844 a railroad company, to whose rights and property the defendant succeeded, constructed upon a strip of land belonging to it a railroad with two tracks, and in 1874, some years after the defendant had become the owner of the railroad and strip of land, it constructed two more tracks, one upon each side of the other two, and the four tracks became a part of its general railroad system.

The house destroyed was built soon after the construction of the first railroad upon the rear end of the lot adjoining and facing the railroad, the front of the lot being upon Broadway. Prior to 1874 the northerly track of the railroad came within about twelve feet from the house, and thereafter it came within about three and one-half feet.

The plaintiff purchased his lot in 1867, and at that time the house was tenantable and was rented for sixteen dollars per month, and continued so rentable until sometime after 1874. After that time the sparks from the engines of the defendant's

road frequently set fire to the house and were so annoying and troublesome that after about 1880 the plaintiff was unable to rent the house and it remained vacant until it was destroyed by fire.

There can be no controversy about the principles of law applicable to this case. The defendant was operating its road under lawful authority past the plaintiff's lot upon its own land, and, therefore, it could not be made liable for the destruction of the house upon the adjoining lot except upon proof of negligence in the management or condition of its engines. The action in such a case is based upon negligence, and a railroad company cannot be made liable for the unavoidable or usual consequences of the proper operation of its road to adjacent property. The law is well stated in an extract found in the brief of the plaintiff's counsel from Pierce on Railroads, 433, as follows:

" The duty of the company to use reasonable care in order to avoid injury resulting to others from the exercise of its powers requires it to avail itself of the best mechanical contrivances and inventions in known practical use which are effective in preventing the burning of private property by the escape of sparks and coals from its engines; and it is liable for injuries caused by its omission to use them. Its duty in this respect is limited to such contrivances as have been already tested and put in use, and it is not required to use every possible contrivance, although already patented and recommended in scientific discussions."

Now, what are the facts here bearing upon the defendant's negligence? There is no evidence and no claim that prior to 1880 the defendant did not use upon its engines the most approved spark arresters. It used the diamond smoke stack which was in universal use on all railroads. There was no evidence that any engine was out of repair. On the contrary, the evidence shows that there was a regular system of daily inspection of the smoke stacks and spark arresters upon the engines in use, and that they were at once repaired when any defects were discovered. Where the railroad passed this lot

there is a steep grade ascending to the westward, and engines drawing trains there were obliged to labor, and sometimes they made headway slowly and with difficulty, and on account of the heavy grade and hard pull they emitted a large amount of smoke and cinders. The only evidence (I am now speaking of the time prior to 1880) from which the plaintiff can claim to infer negligence is the great emission of sparks and the setting of the fires thereby. But the emission of the sparks was continuous and from all engines on account of drawing heavy trains, and thus there could be no claim that any particular engine was defective unless they were all defective, and that is not claimed. On this subject the plaintiff testified as follows: "The showers of sparks and smoke would be thrown into the windows, if they were open in warm weather, and set fire to the carpets; I am speaking what they did; the effect was still greater if they did not pass readily; if they were lodged there, because it was up grade, and the trains would sometimes become stalled; impossible for the locomotives to do their work, and then if the locomotives were lodged in front of that building showers of sparks would be thrown all about, and if it were dry weather the building would take fire, and sometimes when it was not dry it would take fire; the entire roof and alley and all about there would be flooded with these live coals; this state of things continued about ten years. The final result was that the house was destroyed; these fires continued from 1874, the time the additional track was laid, until the destruction of the building by one of these fires in August, 1884."

Another witness testified: "When I have been on one of those pushers and on No. 4 track going from Albany to West Albany I have seen plenty of sparks from that locomotive; plenty of it with a heavy load. You have got to work the engine heavier, and there are more sparks. I can't tell how far it would throw them; a good ways back; the sparks were all over, from the bottom of the grade to the top of the grade; they would fly all the while; worse when it slipped." Another witness testified: "These pushers, as they pushed

up the heavy freight trains on No. 4 through Railroad avenue, always threw sparks more or less; of course, the larger the train, the more exertion and the more sparks were thrown, and the wetter the track, made it so much worse; but the pushers are not the only ones that throw the sparks; the engine ahead throws as many sparks as the other one; these engines used on No. 4, both the forward engines and the pushers, and the others had large, bulging smoke stacks; all of them, as far as I remember."

Another witness testified : " Of course, engines, when they are working hard and pushing and pulling heavy, throw more sparks than they do when they are working light; there is a harder exhaust on the fire, and consequently they throw more sparks; have seen the sparks come out of the stack pretty thick sometimes ; sometimes they go straight up, according to the way the wind blows; I couldn't describe any exact quantity ; they go the direction the wind blows; come thick enough so you can see them readily.   *   *   *   I never saw any spark arresters that would absolutely and entirely prevent sparks from flying.   So far as my judgment and experience are concerned, it is not possible to entirely prevent the emission of sparks from locomotive engines."   Another witness, a tenant in the house, testified : " We didn't dare to leave our windows up in front, because the sparks would fly into the front room.   I never carpeted the front room on that account. Sometimes left the windows open and sparks would come in." Another tenant testified : " I lived there about a year ; occupied the down stairs part ; paid three dollars a month ; it was a small place ; the fires broke out a couple of times while I was there ; I couldn't leave my windows open for the sparks coming in ; caught fire on the roof ; sparks used to come in through the window and door, and I always had to keep them shut."   Another witness testified : " I mean to say every time I saw trains stalled there I saw sparks as big as a walnut coming from the engine, when they commenced working, about every time."   Another witness testified : " When they were working in that way they threw out a

great deal of cinders, sparks and smoke; have observed the size of the sparks they threw out; they were probably half an inch in diameter; live sparks would fly all over on the building. * * * I lived in that vicinity about thirty years; had noticed these things other witnesses had spoken of in regard to trains ever since he had been there, more or less; sometimes there would be heavy trains, and several engines would be used in pushing them up the grade; on such occasions frequently sparks would be emitted from the engines, and would fly all over."

This evidence came from the plaintiff and his witnesses, and it shows that the emission of sparks at that up grade was continuous and inevitable. There is no evidence and no inference that fewer sparks were emitted when there were but two tracks; but as the nearest track was then further from the plaintiff's house, the danger was less. But from 1874 down to 1884 there was no change, and the evidence fails to show that any engine was defective or out of repair, but they were all alike when pulling heavy trains up the grade past the plaintiff's house. It was impossible to give any evidence as to any particular engine, for the reason that all the time from 1874 to the destruction of his house, it does not appear that the plaintiff made any complaint to the defendant, or made any claim whatever that any of its engines were out of order or defective in any way. The inference from this evidence is that the great emission of sparks was inevitable in drawing trains up such a steep grade, and if it was not inevitable it would have been easy for the plaintiff to have furnished some proof showing that it was due to the defective condition of the engines and to no other cause. Under such circumstances the fact of the emission of large quantities of sparks furnishes no evidence whatever to charge the defendant with negligence. If there had been evidence that any particular engine emitted an unusual quantity of sparks of an unusual size that might, within the authorities cited, have furnished *prima facie* proof that the engine was out of repair, and the burden would have been

cast upon the defendant to show that it was in proper condition and that the emission of sparks was inevitable notwithstanding the use of any ordinary care. Suppose it had been shown that all the engines upon the defendant's road were built and equipped in the usual manner, with approved smoke stacks and spark arresters, and yet that they all emitted large volumes of sparks and smoke, would the mere fact of the emission of sparks in such quantities be any evidence to charge the defendant with negligence? And yet that is the only case the plaintiff has against the defendant prior to 1880. The engines passed so near the plaintiff's house that they set fire to it many times during the period from 1874 to 1884; and even prior to that when there were but two tracks, other property was fired in that vicinity by sparks emitted from passing engines. This house was a small wooden structure, and it is quite apparent that its destruction by fire communicated by engines was inevitable at some time.

Therefore, prior to 1880, while the defendant was using the diamond smoke stack, which was in general and universal use, there is no evidence whatever to charge the defendant with negligence.

But the plaintiff claims that about 1880 a new spark arrester used in what are called extension front engines began to come into use; that such engines emitted fewer sparks and that the defendant was thereafter negligent in not adopting the improvement upon its freight engines, and thus in some measure protecting adjacent property from the danger due to escaping sparks. The meshes of the wire netting constituting the spark arrester were the same in both systems, and the only difference in their operation was that fewer sparks were emitted under the new system than under the old. This new system in 1880 was untried and an experiment, and was gradually introduced upon passenger engines, and a short time prior to 1880 the defendant began to introduce it into its freight engines, and it kept on altering its engines until finally before the trial of this action the new system was in general but not universal use upon its engines. There is no proof showing

how expensive or difficult it was to change an engine from one system to the other, or how rapidly the defendant ought to or could have made the change, or that it was negligent or derelict in any way for not introducing the new system faster than it did.    We may assume from our personal observation and from official reports that the defendant after 1880 had in the neighborhood of at least one thousand engines, and what basis is there in this evidence for charging the defendant with negligence for not equipping all these engines with the new system during the brief period of four years?    A railroad is not bound at once to introduce every new appliance which is claimed to make its engines safer or more useful.    It must have time for trial and experiment.    It cannot arrest all of its engines at once to make changes, but must have the time requisite, taking into consideration expense, convenience, the operation of its road, and all the problems connected with such a change.    Before the plaintiff could charge the defendant with negligence in not introducing the new system for arresting sparks prior to 1884 he should have furnished some evidence that it was reasonably practicable and possible to do it.    Therefore, there was no evidence upon which a charge of negligence could be based because the defendant had not introduced this new system prior to 1884.

There is some evidence, not yet noticed, which is said to be sufficient to charge the defendant with negligence.    One witness testified that he knew of three occasions when a hole was knocked in the spark arrester of one of the diamond smoke stacks for the purpose of giving the engine more draft. But whenever that was done it was a mere temporary expedient, to be discovered by the inspectors of smoke stacks and reported at the first opportunity.    And there is no proof whatever that any damage to the plaintiff's building came from a spark arrester which had thus been broken.    There is also proof that on a few occasions plaintiff's witnesses had discovered large sparks, apparently larger than would go through the meshes of a spark arrester in proper condition.    In reference to that evidence it is also to be said that there is no proof

whatever that any damage came to the plaintiff's house from any of those sparks. No effort was made to identify the engine from which they came, and after the lapse of many years it was utterly impossible for the defendant to give any proof about such engine. The defendant is not bound absolutely to keep the spark arresters upon its engines in perfect condition. It is in proof that they would sometimes break and get out of repair, and if the defendant, having a regular system of inspection, repaired them at the first opportunity, it cannot be said to have been negligent.

We are, therefore, of opinion that upon all the evidence the defendant was not in any way legally responsible for the damage done to the plaintiff's property. It is true that his house was burned down and destroyed, and that he thus suffered a loss, but before he can cast the burden of that loss upon the defendant he must show that it violated some legal duty it owed him, and this he failed to do. Upon such evidence as we have here the courts cannot grant him relief if they would. They must follow the law and cannot grant relief against the law.

The judgment should, therefore, be reversed and a new trial granted, costs to abide event.

All concur, except ANDREWS, Ch. J., and O'BRIEN, J., dissenting, and FINCH, J., not sitting.

Judgment reversed.